REED *v.* LOYAL PROTECTIVE ASSOCIATION.

1. ACCIDENT INSURANCE — NOTICE TO INSURER — INCAPACITY OF
   INSURED—EVIDENCE—SUFFICIENCY.
    In an action on an accident policy, evidence examined, and *held*, not to raise the inference that plaintiff was mentally incompetent after the injury received, so as to excuse his failure to notify the insurer of his injury within the period required by the policy.

2. SAME—NOTICE—INABILITY OF INSURED—EFFECT.
    A provision in an accident policy requiring notice of the injury to be given to the insurer within a certain time under pain of forfeiture will not be construed to require strict performance made impossible by act of God; and where the injury shown rendered the insured mentally incompetent to give the notice, the failure was excused.

Error to Eaton; Smith, J. Submitted June 16, 1908. (Docket No. 24.) Decided September 10, 1908.

Assumpsit by Watson Reed against the Loyal Protective Association on a policy of insurance. There was judgment for plaintiff, and defendant brings error. Reversed.

*Huggett & McPeek*, for appellant.

*Rosslyn L. Sowers*, for appellee.

HOOKER, J. The plaintiff, a policy holder, sued the defendant for sick benefit claimed thereunder, in justice's court, where he recovered a judgment for $170. On appeal the learned circuit judge restricted the jury to a verdict for $60, and, from a judgment for that sum, the defendant has appealed.

We infer that the plaintiff was hurt through a fall in his barn, and the testimony indicates that his recovery from the effects of the fall was not complete for some months. The accident happened on October 24th or 26th. A physician was at once called, and his last visit at the home of plaintiff was on October 31st. The policy was made—

"In consideration of the payment of the membership fee, and of the agreements and statements contained in the application for membership, and of the conditions and agreements contained herein and on the back hereof, all of which are hereby made a part of this certificate."

It promised:

"It is further agreed that if said member shall be afflicted with sickness or receive an injury as aforesaid (other than an injury received while riding as a passenger on said public conveyance), which sickness or injury shall independently of all other causes immediately, wholly, and continuously disable and prevent him from the prosecution of any and every kind of business or labor, then said member in case of sickness and subject to the conditions herein and on the back hereof shall be indem-

nified in the sum of 5.00 dollars for the first week and 10.00 dollars a week thereafter, not exceeding twenty-nine weeks in any twelve months that said member is totally disabled, and, if total disability exceeds thirty weeks in any twelve months, then the said member shall be indemnified in the sum of 5.00 dollars a week for a further period not exceeding twenty-two weeks in the aforesaid twelve months; and, in case of a total disability resulting from accident, 10.00 dollars a week for fifty-two weeks from the date of happening thereof.   *   *   *

"Total disability by reason of sickness or accident shall be interpreted as inability of said member to perform any of the duties of his usual occupation, trade or employment, or other business or labor, and requiring the regular and frequent attendance of a physician or surgeon.

"Unless notice of any injury or of the beginning of any sickness is received in writing at the home office of this association in Boston, Massachusetts, on or before the expiration of fourteen days from the commencement of such disability, together with particulars of the injury or sickness, including a statement of the time, place and cause of injury, or date of beginning, and an accurate description of the sickness, signed by the claimant or attending physician or surgeon, the claim shall be valid only for the period dating from the actual time the notification is received at the home office. The claimant shall also furnish within thirty days after the termination of the disability period a sworn statement of the time he was totally or partially disabled, and actual time attended by the physician or surgeon and chairman of the visiting committee of the lodge of which he is a member or of the lodge whose care he is under on and in accordance with blanks provided by this association, and shall furnish such further proof as may be deemed necessary. Failure to comply with the above conditions renders all claims against the association null and void.   *   *   *

"To receive the weekly indemnities for sickness as stated upon the face of this certificate, a member must be totally disabled for fourteen consecutive days, in which event he shall be paid for the number of weeks he shall continue to be totally disabled and shall receive benefits from the Odd Fellows Lodge of which he is a member, provided he shall furnish the required evidence as to his claim, and that he was under the personal care of his lodge during disability and was visited regularly by its

visiting committee, and further provided that, if not within the above proviso, the sickness must be such as to require absolute, necessary, and continuous confinement to the house and shall not be payable for a longer period than the actual, necessary, and continuous confinement to the house.   *   *   *

"The member herein named to secure indemnity agrees that some medical adviser or representative of this association shall have the opportunity to examine him as often as may be required by this association during the disability; also that during the disability he shall be regularly and frequently attended by a duly authorized and legal practicing physician or surgeon fully qualified and recognized by the profession in his State.   *   *   *

"No suit shall be brought in any case until after the expiration of ninety days from the receipt by this association of acceptable proofs of loss, nor after the expiration of six months from the date of termination of the disability period or death."

On December 1st the notice required to be served within 14 days after the accident was received by the company. It was made—i. e., filled out—by the physician and dated December 5th, and it was claimed by the defendant that this noncompliance with the terms of the contract was fatal to plaintiff's action, but the trial judge held that this would be true, unless the jury should find that the plaintiff was insane at the time of the accident—

"To the extent that his mind was so deranged that he was unable to furnish defendant notice of such accident within 14 days from the happening of the accident, which derangement of mind was the result of such accident.   If you so find, then such failure on the part of plaintiff to give such notice within the 14 days as provided for in said policy of insurance would not operate as a forfeiture of plaintiff's right to recover under the policy, but that plaintiff would be entitled to a reasonable time in which to furnish defendant with such notice after his mind had attained its normal condition."

Counsel for defendant assign error upon this instruction on two grounds:

(1) That the contract is an unconditional agreement as

to notice, and not subject to a construction, which does violence to its plain terms.

(2) If this construction were a proper one, the plaintiff has not proved such derangement, and the proof conclusively shows the opposite.

The testimony upon the subject is, in substance, as follows:

Weaver, the physician, testified that when he was called, which was soon after the accident, he "found him suffering from an injury of some sort that he had received, an injury to his head, as I remember it, to his shoulder, back and one rib fractured. He was in a sort of dazed condition, did not fully comprehend things." He made out the notice in December, and at that time examined him at his store. He continued:

"At that time I did not particularly notice any mental impairment. After my first visit, he was in a sort of dazed condition each visit I made there; yet he would answer questions when I would ask him a question. I think that, as I stated on the former trial, all of his answers were rational.

"*Q.* And you never in any of your visits heard him make any irrational statements did you, doctor?

"*A.* Not particularly.

"*Q.* Did he talk with you on the occasion of your first visit?

"*A.* No, sir; he didn't—only as I would ask him a question. He seemed to be suffering considerably from his pain. Part of the time he would answer my questions I would ask him. He didn't seem to realize or know how he was injured, or know anything about it. I asked him how it occurred. He said he didn't know. On other occasions his talk was fairly rational as far as it went. I don't remember that I talked on other matters, except those connected with his illness.

"*Q.* Did you think it strange, doctor, that, injured as he was, he did not talk any more than he did?

"*A.* Oh, I have seen people injured that simulate; that didn't seem to be at themselves wholly. It wouldn't occur to me that a man in that condition was necessarily out of his mind if he did not carry on a lively conversation. * * * The trouble with Mr. Reed after I discon-

tinued my visits was he was complaining of his head—head bothering him—dizziness. I don't remember just what all his complaints were. He had several little things he was complaining of. He seemed rational, certainly. I did not consider him so seriously injured or ill that he should be confined to the house at all. * * * I don't remember how long he was confined to the bed. It seems as though it was a week or two weeks, somewhere along there, a week or ten days. I think he was up the last visit I made there.

"*Q.* Did he seem to be dazed at all at that time?

"*A.* Not particularly so. I should think probably that dazed condition would have passed off anywhere from a week to 10 days entirely, to my best judgment I should think he was perfectly normal at the outside in 10 days.

"*Q.* Even during that 10 days his talk was entirely rational so far as it went?

"*A.* Yes, sir; he would answer all questions put to him. * * *

" Since I was on the stand yesterday I have looked at my books, and learned when and how many visits were made by me to Mr. Reed's home during the time I attended him. The dates are October the 26th, 27th, and 31st. Those were the only visits I made to the home."

Redirect examination:

"*Q.* The affection Mr. Reed was bothered with is that what you term a ' concussion of the brain?'

"*A.* Yes; he might have had a slight concussion."

Nelson Gibbard was the next witness to testify upon this subject. He was at plaintiff's home the next day.

"I reside less than three-quarters of a mile from the plaintiff. I knew of his accident last fall, and was at his home the next day. I couldn't tell the date.

"*Q.* Can you tell us how long he was sick abed?

"*A.* Well, I couldn't tell just that exactly. He was sick two or three weeks I should judge. The first week after the accident I was at his home every day, and then, as it grew later, I lapsed a day or two. I continued to visit at his home for a matter of six weeks or two months afterwards at intervals. * * *

"*Q.* I will ask you how he appeared to be affected with regard to his mental faculties.

"*A.* They were not good. He didn't know anything about how the accident happened or anything.

"*Mr. Huggett:* I object to that.

"*The Court:* Let the record show that is objected to and objection overruled.

"*Mr. Sowers:* I think the answer is hardly responsive. The question was as to his being able to advise with regard to his business.

"*Mr. Huggett:* That question is objected to, and you withdrew it.

"*Mr. Sowers:* I ask what his mental condition was.

"*Mr. Huggett:* I object to that from this witness.

"*The Court:* It would seem to me that there might be some objection to this witness. He doesn't claim to be a doctor.

"*Mr. Sowers:* Your honor please, he was there. I think that he says he took care of this man.

"*The Court:* That is true. I think he can tell about how the plaintiff appeared in relation to his mental capacity, whether he seemed to have any, or not, rather than to state the conclusion that he was incompetent.

"*Mr. McPeek:* Shouldn't he state what acts he considered were not rational?

"*The Court:* Yes.

"*The Witness:* Give what acts that I considered?

"*Q.* No; as to his mental condition. How he acted.

"*A.* Why, he acted dazed, and his mental condition was not good. I wouldn't say as to how long that condition existed, but it was so for the first few days that I was there, but, as to being any length of time, I wouldn't state any positive time; but I do know that he couldn't tell, and I don't know as he can now, the way it happened. He didn't while I was there. He didn't know anything about how it was done. * * *

"I wouldn't say that he made complaints of his distress the first evening I went there, which was the evening following when he was hurt. I understood he was hurt the night before. I think it was three or four days afterwards that I talked with him about how he got hurt. I am sure it was on the day of the doctor's second visit. The doctor came there while I was there. I couldn't say that I heard the doctor talk with him. I think I went out of the room when the doctor went in there because it is a small room. I talked with him before the doctor came. As to how he got hurt, he said he didn't know. Didn't tell me how he

thought he might have got hurt. I don't think it was talked over with him. He fully appreciated he had been hurt. He said he didn't remember where he was when he was hurt. I think he knew where he was at that time. He appeared to understand fully what we were talking about, because I asked him how he got hurt, and he didn't know. I presume he fully appreciated we were talking about his injury he had received. He did not talk rationally at that time, because he was flighty. He was kind of flighty about different things. He would be off different times. I don't think he was flighty all the time. I couldn't say what was the cause of it. I didn't see the doctor there again. It was longer than three or four days before he was perfectly rational to talk with. He at that time talked and answered my questions, and told me he didn't remember just how he was hurt. I couldn't say that was all I talked with him, for I was there perhaps two months on and off. He stayed at home for two months. He was not downtown that I know of. I couldn't say as to his being confined to the house all that time, but he was home every time I went there. He was in the house. Sometimes I went in the evening and sometimes in the forenoon. I know nothing about his being downtown and making out his application for insurance. I never knew there was any insurance in no shape or manner until after this trial was started. I never heard of it. I didn't know he was insured. I didn't say he was confined to the house. I said he was in the house every time that I went there to see him, and I talked with him. He was not dazed all that time. From what I know he was just as clear as I was. I don't think he was within a week or 10 days after this occurred. I have no means of telling just how long it was because I didn't pay any attention to it any more than neighborly—going in to see."

Redirect examination:

"*Q.* Mr. Huggett asked you how long he appeared to be dazed. I will ask you the same question. You did not complete the answer, I do not think.

"*A.* Well, I couldn't swear to that positive, because— but I should think it was a week or 10 days, because I didn't pay no attention to it. Just went there as a neighbor."

Recross examination:

"I think a week or 10 days. It might have been two weeks. It might have been less. I wouldn't put it any time; that is, I wouldn't put it 2 months, of course."

The next witness to prove derangement was the plaintiff himself. He testified:

"I suffered from an accident last fall, some time the last of October. I think it was the 24th. I don't know how that accident occurred. I was affected through my head and back of my neck and back, run right down my back as result of that accident. One or two ribs was broken. I don't know how long I was confined to the house. It must have been four or five weeks before I could get out any to get around any to amount to anything. I notified the company or caused them to be notified of that accident after the accident as soon as I was able to.

"Q. How did that accident affect you as regards your mentality?

"A. Well, sir, I didn't remember anything about the —in fact, I didn't know as I had a policy until—

"Q. Did you as soon as you learned, when your mental condition was of that nature give notice to the company?

"A. Yes, sir, I caused a letter to be written by James Moore, the local collector here, or agent for the company. I suppose the defendants have that letter. I have not got it, I did not retain a copy.  *  *  *

"In my letter I stated or caused it to be stated that, as soon as I recovered or able to, that I notified the company. I don't know what my mental condition was after the accident. I was not able to carry on my business, nor to direct the affairs of my business. That continued until towards spring. In fact, I never recovered yet from it. As to my mental trouble, as soon as I was mentally able, I notified the company."

Cross-examination by Mr. Huggett:

"I don't know where I received my injury. I don't know how I knew when I made the statement here that I received it in my barn. I don't know where I got hurt, anything about it; I didn't know it was in my statement that I received it in my barn. I remember the day now. I couldn't say when I came to that recollection, a good while afterwards. I couldn't say how long. I don't remember where I was, anything about it. I couldn't tell

you the last thing I remember before that accident occurred. I remember going home from Charlotte, where I had been before the accident. I was down here alone; couldn't tell you what I came down for; don't remember any business I did on that occasion. I drove one horse down. I don't know which one. I couldn't tell you what I did with the horse when I got home.

"*Q.* Were you dazed so that you couldn't tell that?

"*A.* I don't know what it was. I don't—I go to saloons. I never drink to excess. I drink a glass of beer once in a while. I don't remember what I did the day before that.

"*Q.* Do you remember anything that occurred before that time? [No response.]

"It is likely that I remember some transaction that occurred before that time. I couldn't tell you the last thing I remember before that occurred. I don't remember going into a saloon that day. I remember going home. Don't remember going to the barn, or that something occurred there; that I was injured or fainted or something of that kind. I don't remember the first time the doctor came there or the second, as I know of; don't know as I remember the third, I remember his being there. I remember he was there at different times. I don't remember that he examined me. I can't tell how many times he was there. I paid his bill. Don't remember having a conversation with the doctor. I sold my stock last fall, quite a little of it, hogs and cattle. I couldn't tell you how many I sold. Don't know as I sold any cattle last fall. Couldn't tell you when I sold my hogs or what I got for them. I didn't bring them down myself. A man brought them down for me. I rode down in a buggy, I think. Don't know whether I took the money or not. I remember selling the hogs to Bowes & Griffin.  *  *  *

"I don't want the jury to understand that I didn't know anything after this accident occurred. I don't know whether this man was there or not, because I don't. I don't remember the doctor being there the first time. I don't know who took care of me for a spell. For how long a time I couldn't say. After I got where I did know something, I suppose the family took care of me, either my wife or Mr. Gibbard. They were there, I believe. Mr. Gibbard said he was there a good deal. I don't remember his being there. After a spell, I knew he was there. Can't tell you when, anything about it. I can't

tell whether one day or three days of his being there. I suppose other of the neighbors called there. I don't know. I couldn't say when I first got out of the house. I guess I was out in January, I was up and around the house. I don't remember anything about making the proofs in this case. After a spell I remembered seeing Mr. Sowers, but I didn't see him for quite a while. The lodge offered to help me up there.

"*Q*. When was that?

"*A*. After—I couldn't tell you when it was. I can't say when it was. I don't know as any one in particular told me they would help me. I don't know as I told them anything when they offered to help me.

"*Q*. Now, sir, did you have any trouble in recognizing Dr. Weaver when he was up there to see you?

"*A*. I don't remember his being there until the last time. I don't remember of his being there any.

"*Q*. You do not remember until he was there the last time?

"*A*. I don't know as I could remember his being there.

"*Q*. Didn't you state before you did remember his being there?

"*A*. I don't remember his being there. * * *

"*Q*. You testified here yesterday to the letters you wrote, that they were written and received. Did you mean by that you knew they were written and knew they were received at the time?

"*A*. I couldn't tell you whether I did or not.

"*Q*. What did you mean yesterday by swearing you knew these letters were written and these letters you received that were put in evidence here? Was that simply because your counsel asked you to?

[No response.]

"*Q*. The facts are you knew all about it?

"*A*. I couldn't say. No, sir; I don't remember all about it. I remember something about the letters, but I couldn't say much about them. I don't remember much about them. I couldn't explain it. I couldn't say when it was written. When I went to Mr. Sowers with the policy, he did not tell me that I ought to have given a notice. I don't think he did. I don't know as I took the policy to him. I think somebody else took the policy to Mr. Sowers. I couldn't say who. I couldn't tell you when it was I told them I didn't want that order. It was a long time afterwards. * * *

"*Q.* How do you know it rendered you mentally incompetent for 14 days?

"*A.* I don't remember anything about it, and don't now. I don't remember when I did recover consciousness. I think I have recovered consciousness at the present time. I couldn't tell you now when I remember I was conscious of what was going on around me.

"*Q.* You are swearing to it simply because it is alleged in the declaration that you recovered consciousness?

"*A.* No, sir; I don't remember anything about it. I couldn't tell you whether I recovered consciousness before the 1st of December. I was not attending lodge before that time. I might have been down here in the city several times. I don't know; not a good many times."

Morris Bowes testified: That he saw plaintiff the second Sunday, about 10 days after he was hurt. He found him in bed.

"*Q.* How did he appear mentally as to his mind being clear or otherwise, how did he appear?

"*A.* Why, he didn't have anything to say to us. there was a couple of us went up there to visit him, and he was in bed, and he didn't have much of anything to say to us, only as we would ask him a question, you know.

"*Q.* Did he originate any conversation whatever?

"*A.* No, sir; nothing more than answer questions. We asked him where he was hurt and how, and he kind of motioned so and so, and that is about all there was to it. * * *

"I don't think it was the first Sunday after he was injured. I think it was the second Sunday. I am pretty positive. I think it was after dinner. He was in bed. I think Mr. Ells was there, and Griffin went with me. If I remember right, Ells set in the sitting room or set in the room, and, when we went in the room, he got up and went out. So far as I know, they admitted everyone who came there to see Mr. Reed. They let us in. We didn't talk with him much. We asked him how he felt and he told us, and he couldn't. I says: 'Can't you get up, Wat?' He said every time he moved, why his head—his head bothered him, made him dizzy, and he couldn't sit up in bed. He said his head was hurt and went blind and dizzy like when he would try to sit up. That is about all. He didn't know how he got hurt. I said to him: 'Wat, where was you hurt?' He put his hand up, and he said

in the back of his neck and back of his head like. At the same time there was a sort, if I remember right, there was quite a bruise on the side of his head at that time.

"*Q.* His questions were all rational, were they?

"*A.* Why, he would say, 'Yes' or 'No.' We didn't stay long—didn't talk much with him.

"*Q.* Seemed like a perfectly sensible explanation, didn't it, the one he made of his symptoms?

"*A.* He said 'Yes' or 'No.' I suppose he meant it. That is all there was. I didn't question him much.

"*Q.* He described them to you?

"*A.* He said he was hurt in the back of his neck and hurt in his head. We didn't stay but a few minutes. He didn't try to talk to us much or tell us much. I talked with members of the family, and they talked more about that than he did.

"*Q.* Did you consider it strange for a man sick in bed not to talk any more than he did; would you expect him to talk any more?

"*A.* It seems so in 10 days.

"*Q.* You would expect him to would you?

"*A.* I would think so."

He next saw him when he bought the hogs.

"*Q.* Do you remember ever seeing him when you thought he was not perfectly rational and normal, except when you thought he acted a little queer on the occasion of your first visit there?

"*A.* I think he was all right other times from anything I know. He has always acted. I think at the present time he is the same as he was before the accident."

Fred Griffin was present with Bowes when he called on plaintiff. He testified:

"He didn't have much to say to us. He merely laid there. Of course, we spoke to him when we went. He didn't say much. We talked to him very little, and he didn't say much, and Mr. Ells was there, and we visited and we talked and visited with his wife. We asked a few questions, and he didn't have much to say to us. We was not there a great while. The first time I met him here in town was the time he was down with his hogs. He appeared very quiet, and didn't act to me as though he felt very well."

We have given this testimony at great length to avoid

the possible omission of anything that can be said to warrant an inference that the plaintiff was deranged or devoid of understanding for the period of 14 days. The testimony of the physician clearly shows that he was not, for he states that he never heard him make a particularly irrational statement, and that the dazed condition was all he saw, and he thought that he was perfectly normal at the outside in 10 days, and that even during that 10 days his talk was entirely rational as far as it went. Neither Gibbard's nor Bowes' testimony justified an inference of irresponsibility, and, if we strike out the statement of the plaintiff that he sent the notice as soon as he was mentally competent, we have nothing left but an alleged forgetfulness of some things which occurred. We think that there is not proof from which it can be inferred that this plaintiff was prevented from sending his notice by reason of derangement or inability to understand and remember, and if an alleged insane person can be allowed to prove his own insanity, which is anomalous, to say the least, he cannot do it by merely swearing point blank to the statement that "he sent the notice as soon as he was mentally competent." That is the question which the jury was to decide. We are of the opinion that the plaintiff has failed to show his inability to serve the notice. There is no testimony from which a just inference can be drawn that he was deranged at all, certainly none that such was his condition until December 1st. For this reason, the case must be reversed, for a verdict should have been directed for defendant.

In view of a possible new trial, we consider another question, viz.: Would such an impediment to the serving of notice within the prescribed period relieve the plaintiff from the forfeiture? We assume that no one will contend that a court of justice has authority to change the obligations of a contract which the parties have seen fit to make. The case is resolved, then, into a question of construction of the language used. After providing for indemnity, the contract provides:

"Unless notice of any injury or of the beginning of any sickness is received in writing at the home office of this association in Boston, Massachusetts, on or before the expiration of fourteen days from the commencement of such disability together with particulars of the injury or sickness, including a statement of the time, place and cause of injury, or date of beginning and an accurate description of the sickness, signed by the claimant or attending physician or surgeon, the claim shall be valid 'only for the period dating from the actual time the notification is received at the home office. * * * Failure to comply with the above conditions renders all claims against the association null and void."

We all know that a failure to perform any ordinary contract is not excused by inability to perform an unqualified promise. See Pollock on Contracts (7th Ed.), p. 408 et seq. Certainly this is true, unless the failure is due to the act of God, and in such cases, while it may sometimes excuse the promisor from performance, it is not so certain that it will permit his enforcing the contract which he has' been unable to fully perform against the other party, which is what is sought here. It is urged that the authorities are overwhelmingly against the contention of the plaintiff in this case, and many are cited. But we are committed to the doctrine in insurance cases, that a provision requiring a notice on pain of forfeiture will not be construed to require strict performance, when by a plain act of God it is made impossible of performance.

In the case of *Phillips* v. *Benevolent Society*, 120 Mich. 142, the certificate provided:

"In all cases of accident or sickness, immediate notice was required to be given in writing, addressed to the secretary, with full particulars thereof. Failure to give such notice within five days from the happening of such accident or beginning of illness renders the claim invalid, and it cannot be recognized or paid."

We said:

"It is claimed that the plaintiff did not give timely notice of his injury, in accordance with the provisions of the charter and by-laws. Notice was served upon the

company with promptness after he had been informed by one of his physicians that his illness did not result from disease, but from an accident. We do not think that the first notice that he was suffering with neuralgia was binding upon him. It would be a hard rule, and one which the rules of the company must place beyond doubt, which would deprive a member of his benefits through the mistake of his physician. The notice was served as soon as he ascertained that the accident with which he had met was the occasion of his trouble. We think this a sufficient compliance with the by-law."

This case was decided in 1899, and we see no means of distinguishing the question now under consideration from the one then decided. See, also, the later cases of *Woodmen Accident Ass'n* v. *Byers*, 62 Neb. 673 (55 L. R. A. 291), and *Comstock* v. *Accident Ass'n*, 116 Wis. 382, and *Munz* v. *Insurance Co.*, 26 Utah, 69 (62 L. R. A. 489), and cases cited. These cases seem to proceed on the theory that it cannot be supposed that the parties contemplated that the assured should be required to do an impossible thing or suffer a forfeiture of existing rights.

There are other questions in the case, but they may not arise on another trial, and we do not discuss them.

The judgment is reversed, and a new trial ordered.

Montgomery, Ostrander, Moore, and Carpenter, JJ., concurred.